NOT FOR PUBLICATION[1]

# UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE TENTH CIRCUIT

_____

IN RE FRONTLINE MEDICAL
SERVICES LLC,

Debtor.

_____

BUSCH LAW FIRM, LLC,

Appellant,

v.

FRONTLINE MEDICAL SERVICES
LLC,

Appellee.

BAP No. CO-25-009


Bankr. No. 22-13411
Chapter 11


OPINION

_____

Appeal from the United States Bankruptcy Court
for the District of Colorado

_____

Before **SOMERS**, **HALL**, and **THURMAN**, Bankruptcy Judges.

_____

**THURMAN**, Bankruptcy Judge.

This appeal presents another chapter in debtor Frontline Medical Services LLC's

("Appellee's") efforts to reorganize. Previously, the Tenth Circuit Bankruptcy Appellate

---

[1] This unpublished opinion may be cited for its persuasive value, but is not precedential, except under the doctrines of law of the case, claim preclusion, and issue preclusion. 10th Cir. BAP L.R. 8026-6.

Panel (the "BAP" or "Court") reversed the United States Bankruptcy Court for the District of Colorado's (the "Bankruptcy Court's") confirmation order (the "First Confirmation Order") and remanded to the Bankruptcy Court for further findings (the "Remand Order"). On remand, the Bankruptcy Court reviewed the record and determined that Appellee's proposed plan of reorganization was feasible. The Bankruptcy Court then entered *Additional Findings of Fact and Conclusions of Law* (the "Remand Findings")[2] and confirmed Appellant's *Second Amended Subchapter V Plan of Reorganization* (the "Plan") over creditor Busch Law Firm, LLC's ("Appellant's") continued objection. Appellant now appeals the Remand Findings on both procedural and substantive grounds.

For the reasons explained below, this Court determines the Bankruptcy Court adequately complied with the BAP's Remand Order and made the required findings and conclusions based on sufficient evidence. Thus, the Remand Findings were proper, and we therefore affirm.

## I.     Jurisdiction

This Court has jurisdiction to hear timely filed appeals from "final judgments, orders, and decrees" of bankruptcy courts within the Tenth Circuit, unless a party elects to have the district court hear the appeal.[3] Appellant timely filed a notice of appeal from the Remand Findings, which is a final order.[4] No party has elected to have the United

---

[2] Remand Findings in Appellant's App. at 2625.
[3] *See* 28 U.S.C. §§ 158(a)(1), (b)(1), and (c)(1); *see also* Fed. R. Bankr. P. 8003, 8005.
[4] *See In re Novinda Corp.*, 585 B.R. 145, 151 (10th Cir. BAP 2018) ("An order . . . confirming a Chapter 11 plan is a final order.").

States District Court for the District of Colorado hear the appeal.[5] Accordingly, the BAP has jurisdiction to hear this appeal.

## II.     **Background**

The BAP has previously thoroughly explained the facts that precipitated Appellant's first appeal, which this Court will refer to as "*Frontline I*."[6] This Court will commence its explanation where the *Frontline I* Court left off.

In *Frontline I*, the BAP held that the Bankruptcy Court made no error when it determined that Appellee did not file its bankruptcy petition in bad faith.[7] The BAP further held that the Bankruptcy Court did not abuse its discretion in denying Appellant's then-pending motion to dismiss.[8] The BAP did, however, reverse the First Confirmation Order on the sole ground that the Bankruptcy Court "did not apply the correct legal standard in analyzing feasibility for a nonconsensual plan proposed under subchapter V."[9] The BAP explained that the Bankruptcy Court erred when it made "no specific findings [as to the feasibility of Appellee's proposed plan] under either § 1191(c)(3)(A) or § 1191(c)(3)(B)."[10] The BAP remanded "this issue" to the Bankruptcy Court for "further findings consistent with [its] opinion."[11]

---

[5] *See* Notice of Appeal and Statement of Election at 2 in Appellant's App. at 2630.
[6] *See In re Frontline Med. Servs. LLC*, 665 B.R. 818, 822–25 (10th Cir. BAP 2024) (summarizing the factual background of the dispute).
[7] *Id.* at 828–29.
[8] *Id.* at 830.
[9] *Id.* at 832.
[10] *Id.*
[11] *Id.* The *Frontline I* Court's choice to only remand "this issue" for "further findings" carries significant meaning. Entailed in the text of the Remand Order is an acknowledgment that there are no other issues being remanded. Further, the text of the

The BAP issued the Remand Order on December 26, 2024. On February 24, 2025, the Bankruptcy Court entered the Remand Findings.[12] In the Remand Findings, the Bankruptcy Court "incorporate[d] its prior findings of fact and conclusions of law" from the First Confirmation Order and made additional findings and conclusions as to 11 U.S.C. §§ 1191(c)(3)(A) and (c)(3)(B).[13]

The Bankruptcy Court analyzed the statutory requirements of § 1191(c)(3)(A) and concluded that "Frontline satisfied its burden of proving it will be able to make all payments under the Plan."[14] "[O]ut of an abundance of caution," the Bankruptcy Court then analyzed feasibility under § 1191(c)(3)(B).[15] The Bankruptcy Court concluded that "Frontline has shown at least a reasonable likelihood it will be able to make all payments under the Plan" and "the Plan provides appropriate remedies to protect the holders of claims or interests in the event that the payments are not made."[16] Fourteen days after the entry of the Remand Findings, Appellant filed a Notice of Appeal and Statement of Election.[17]

---

*Frontline I* opinion limits the remand procedure to only that which can produce "further findings."

[12] Remand Findings in Appellant's App. at 2625.

[13] *Id.* at 1 in Appellant's App. at 2625. Unless otherwise noted, all references to "Section," "§," "Bankruptcy Code," and "Code" refer to the United States Bankruptcy Code, 11 U.S.C. § 101, et seq., and all references to the "Rules" refer to the Federal Rules of Bankruptcy Procedure.

[14] *Id.* at 2 in Appellant's App. at 2626.

[15] *Id.*

[16] *Id.*

[17] Notice of Appeal and Statement of Election in Appellant's App. at 2629.

### III.     Issues Presented and Standards of Review

Although Appellant presents over fourteen issues in its brief,[18] its position in essence boils down to a single issue: whether the Bankruptcy Court erred in entering the Remand Findings.

---

[18] Appellant's specific issues on appeal are: "1. Whether the Bankruptcy Court erred by failing to adhere to the Bankruptcy Appellate Panel's mandate completely reversing the Bankruptcy Court's confirmation order . . . 2. Whether the Bankruptcy Court erred by failing to hear new evidence, require additional briefing, and to hold a confirmation hearing on the confirmation of the subchapter V plan . . . 3. Whether the Bankruptcy Court erred by failing to address and consider the impact on the feasibility of the subchapter V plan of the Veteran Administration's inability to assess the Debtor's 'responsible' contractor status under 48 C.F.R. §§ 9.100, 9.103(b), and 9.104-1 . . . 4. Whether the Bankruptcy Court erred in finding that the Debtor and its principals did not violate federal law . . . 5. Whether the Bankruptcy Court erred in finding that the Debtor and its principals are not likely to be barred from obtaining future government contracts . . . 6. Whether the Bankruptcy Court erred in failing to address and consider the impact of the Debtor's lump-sum payment for the full amount of its five-year projected disposable income under the subchapter V plan, on feasibility under 11 U.S.C. § 1191(c) . . . 7. Whether the Bankruptcy Court erred in concluding that the Debtor's stock default remedies provided for under the subchapter V plan were adequate under 11 U.S.C. § 1191(c)(3)(B) . . . 8. Whether the Bankruptcy Court erred in determining that, under applicable case law, default remedies in a Subchapter V plan that only point creditors to existing remedies available at law, are adequate where a creditor objects and proposes additional remedies, under 11 U.S.C. § 1191(c)(3)(B) . . . 9. Whether the Bankruptcy Court erred in finding that the Debtor's administrative Rough Order of Magnitude and Request for Equitable Adjustment against the Veterans Administrative would be expensive and time consuming to pursue, with a low likelihood of success, with respect to only the reimbursable allowable legal fees line item included in that claim . . . 10. Whether the Bankruptcy Court erred in confirming the Debtor's subchapter V plan under 11 U.S.C. §§ 1129(a) and (b); 1191(a)-(d) of the Bankruptcy Code . . . 11. Whether the Bankruptcy Court erred in confirming the Debtor's Subchapter V plan because the subchapter V plan was not feasible . . . 12. Whether the Bankruptcy Court erred in confirming the Debtor's subchapter V plan because it did not comply with the applicable provisions of Title 11 . . . 13. Whether the Bankruptcy Court erred in confirming the Debtor's subchapter V plan because the plan is not fair and equitable under subchapter V . . . 14. Whether the Bankruptcy Court erred in confirming the Debtor's subchapter V plan is feasible when the Debtor had not complied with applicable federal law, including the Federal Acquisition Regulation, criminal law, and the False Claims Act . . . ."

5

To correctly analyze this issue, this Court must first analyze two sub-issues: (1) whether the Bankruptcy Court procedurally complied with the BAP's Remand Order in *Frontline I* and (2) whether the Bankruptcy Court based its Remand Findings on sufficient evidence.

Regarding the first sub-issue, a reviewing court examines a lower court's compliance with a remand mandate under a de novo standard.[19] However, if a remand order permits the lower court to act in a discretionary capacity, then the reviewing court should weigh the decision of the lower court under an abuse of discretion standard.[20]

Regarding the second sub-issue, a reviewing court must examine a lower court's factual findings under a clear error standard.[21] "A finding of fact is clearly erroneous if it is without factual support in the record or if, after reviewing all of the evidence, we are left with the definite and firm conviction that a mistake has been made."[22]

---

Appellant's Br. at 2–5. Further, Appellant's issue 14 contained twelve sub-issues, which pertain to the larger question about Appellee's alleged noncompliance with federal law. *Id.* at 5–9.

[19] *See, e.g.*, *Padilla-Caldera v. Holder*, 637 F.3d 1140, 1145 (10th Cir. 2011) ("We review de novo the BIA's compliance with our mandate[.]"); *U.S. v. Shipp*, 644 F.3d 1126, 1129 (10th Cir. 2011) ("Interpretation of the mandate is an issue of law that we review de novo.").

[20] *See U.S. v. Walker*, 918 F.3d 1134, 1144 (10th Cir. 2019) ("We review the district court's interpretation of our mandate de novo . . . and then ask whether the court abused the measure of discretion that our mandate left to it.").

[21] *See, e.g.*, *Phillips v. White (In re White)*, 25 F.3d 931, 933 (10th Cir. 1994) ("The bankruptcy court's findings of fact are not to be set aside unless clearly erroneous."); *In re Inv. Co. of the S.W.*, 341 B.R. 298, 310 (10th Cir. BAP 2006) ("Whether a plan is feasible is a question of fact, subject to the clearly erroneous standard on appeal from an order confirming the plan.").

[22] *In re Miniscribe Corp.*, 309 F.3d 1234, 1240 (10th Cir. 2002) (quoting *Conoco, Inc. v. Styler (In re Peterson Distrib., Inc.)*, 82 F.3d 956, 959 (10th Cir. 1996)).

Appellant complains the Bankruptcy Court did not hold additional hearings or solicit additional briefs from the parties after *Frontline I*.[23] Appellant contends that this failure to hold additional proceedings is a reversible error for noncompliance with the BAP's Remand Order.[24] Appellant also contends that the Bankruptcy Court made a reversable substantive error when it determined that the Plan is feasible despite failing to consider additional facts and draw conclusions from them.[25] This Court will address each argument in turn.

## IV.     <u>Analysis</u>

### A.     *The Bankruptcy Court complied with the procedural requirements of the BAP's Remand Order in* Frontline I.

In *Frontline I*, the BAP reversed the First Confirmation Order because the Bankruptcy Court did not make specific findings as to the feasibility of Appellee's Plan. However, the BAP did not include any additional procedural requirements in its opinion, other than the mandate that the Bankruptcy Court make "specific findings" under either § 1191(C)(3)(A) or § 1191(c)(3)(B). In other words, the BAP deferred to the Bankruptcy Court the means by which to make the additional specific findings. Now on appeal,

---

[23] Appellant's Br. at 25–27.

[24] *Id.* at 26–27.

[25] *Id.* at 27–54. In support, Appellant raises three issues: (1) whether the Bankruptcy Court erred when it determined that Appellee was not at risk for liability under the False Claims Act and associated criminal statues, or for having its contractor status with the United States Veterans Administration revoked; (2) whether the Bankruptcy Court erred when it determined that the Plan's default remedies were sufficient to protect Appellant's interests; and (3) whether the Bankruptcy Court erred when it did not assess the impact of Appellee's lump-sum payment on the continued feasibility of its Plan. This Court will address Appellant's arguments as part of its substantive analysis of the Remand Findings.

Appellant contends that the Bankruptcy Court failed to comply with *Frontline I*'s Remand Order and erred in two ways: First, Appellant argues that the Bankruptcy Court inappropriately reincorporated its reasoning from the First Confirmation Order; and second, the Bankruptcy Court did not conduct additional hearings or solicit additional briefs from the parties on remand.[26]

Both arguments fail because *Frontline I* neither voided the Bankruptcy Court's prior analysis nor mandated that the Bankruptcy Court conduct additional hearings.

1.    The Bankruptcy Court did not err when it incorporated its prior findings and conclusions by reference into its Remand Findings.

"A judgment reversed by a higher court is without any validity, force or effect, and ought never to have existed."[27] It is indisputable that the BAP reversed the First Confirmation Order. *Frontline I* resulted in a reversal because the Bankruptcy Court failed to apply the correct standard for feasibility under § 1191(c)(3). As such, *Frontline I* did not annul the Bankruptcy Court's conclusions on the other confirmation issues pertaining to the feasibility of Appellee's Plan. Simply put, the BAP's reversal in *Frontline I* did not void any of the other findings or conclusions of the Bankruptcy Court—it just mandated additional findings and possibly a new conclusion under § 1191(c)(3).

While it is true a mandate from a superior court "compels compliance on remand with the dictates of a superior court," if the superior court's ruling does not reverse all of

---

[26] *See id.* at 26–27.
[27] *Mason v. Texaco, Inc.*, 948 F.2d 1546, 1551 (10th Cir. 1991) (internal quotations omitted).

the lower court's reasoning, then the lower court may incorporate its prior analysis.[28]

Therefore, if an appellate court has not expressly reversed the entire reasoning of a

previous order, a trial court "may incorporate by reference all of its other findings made

in [a] case, which . . . have [been necessarily] upheld."[29]

The Bankruptcy Court therefore committed no legal error when it incorporated its

prior findings and conclusions in its Remand Findings, because those findings and

conclusions were never voided.

> 2.      The Bankruptcy Court did not err when it issued the Remand Findings
>         without conducting additional hearings.

Because the BAP did not mandate that the Bankruptcy Court conduct specific

proceedings, the BAP gave the Bankruptcy Court discretion to weigh evidence under

§ 1191(c)(3). The only guardrails that *Frontline I* imposed on the Bankruptcy Court was

to require its remand findings and conclusions be "consistent with this opinion [of

*Frontline I*]."[30]

It is a widely accepted principle that "courts have the inherent authority to manage

their dockets."[31] And the Tenth Circuit has indicated that when a remand mandate does

---

[28] *Cf. Bird v. Winterfox, LLC (In re Kitts)*, 447 B.R. 330, 334 (Bankr. D. Utah 2011) (affirmed in part, vacated in part, and reversed in part on other grounds by *Bird v. Winterfox, LLC (In re Kitts)*, No. 2:11-cv-233, 2012 WL 113820 (D. Utah Jan. 13, 2012) (unpublished)).

[29] *U.S. v. Montoan-Herrera*, 351 F.3d 462, 467–68 (10th Cir. 2003). *See also Overton v. City of Austin*, No. A-84-CA-189, 1987 WL 54389, at *7 n.6 (W.D. Tex. Sep. 15, 1987) (unpublished) ("Because this case was remanded for reconsideration in light of *Thornburg*, the Court's previous findings concerning Plaintiff' constitutional claims remain intact and are adopted here by reference.").

[30] *In re Frontline Med. Servs. LLC*, 665 B.R. 818, 832 (10th Cir. BAP 2024).

[31] *Dietz v. Bouldin*, 579 U.S. 40, 47 (2016).

not set out procedures for a lower court to follow, lower courts have discretion to hold proceedings as they see fit.[32]

The Bankruptcy Court was not prohibited from relying on the same briefs and transcripts when it made its Remand Findings. If the Bankruptcy Court did not need any additional information to analyze the Plan for feasibility issues under § 1191(c)(3), then such a belief is a permissible application of the Bankruptcy Court's discretion and a reasonable use of the Bankruptcy Court's inherent authority to manage its docket.

Therefore, the Bankruptcy Court did not make a legal error. Its Remand Findings must be affirmed on this procedural sub-issue.

---

[32] *See Proctor & Gamble Co. v. Haugen*, 317 F.3d 1121, 1125 (10th Cir. 2003) ("[W]hen the remand is general, however, the district court is free to decide anything not foreclosed by the mandate.") (quoting *Hicks v. Gates Rubber Co.*, 928 F.2d 966, 971 (10th Cir. 1991)). This principle may also be derived from an exploration of the Tenth Circuit cases, *Pittsburg & Midway Coal Mining Co. v. Watchman*, 52 F.3d 1531 (10th Cir. 1995) (abrogated on other grounds by *Hydro Res., Inc. v. U.S. E.P.A.*, 608 F.3d 1131 (10th Cir. 2010)) and *Texaco, Inc. v. Hale et al.*, 81 F.3d 934, 938 (10th Cir. 1996). In *Watchman*, after the Tenth Circuit identified and adopted a multi-prong test from the Eighth Circuit as to what constitutes a "dependent Indian community," it remanded the issue to the United States District Court for the District of New Mexico for further proceedings. *Watchman*, 52 F.3d at 1546. The Tenth Circuit explained that "[o]ur review of this issue [on a subsequent appeal] would be substantially assisted by the district court's making specific, detailed factual findings on each of the four-prongs of the dependent Indian community inquiry. . . . We believe the district court must assess the evidence and reach conclusions on such issues on remand." *Id.* However, in a subsequent case, the Tenth Circuit remarked, "*Watchman* simply does not require factfinding hearings when the operative fact issues have been resolved through other means." *Texaco*, 81 F.3d at 938. This Court views the binding precedent of *Watchman* and *Texaco* as granting lower courts discretion to implement open-ended procedural remand mandates.

B.    *The Bankruptcy Court based the Remand Findings on sufficient evidence.*

Section 1191(c)(3) governs the feasibility of a non-consensual subchapter V small business plan of reorganization. For a plan to be confirmed, this statute requires a finding that one of two conditions exist: "(A) The debtor will be able to make all payments under the plan; or (B) there is a reasonable likelihood that the debtor will be able to make all payments under the plan; and the plan provides appropriate remedies . . . [if] the payments are not made."[33]

Subsection (c)(3)(A) and subsection (c)(3)(B) are joined by an "or" disjunction, meaning that a bankruptcy court may confirm a plan by finding either the debtor will be able to make all plan payments or there exists a reasonable likelihood that the debtor will make plan payments, and in the event the debtor fails to do so, there exist sufficient default remedies for creditors. Because a finding of plan feasibility is subject to the clearly erroneous standard of review, if the Bankruptcy Court based its findings of feasibility on sufficient factual grounds, its determinations must be affirmed.

1.    The Bankruptcy Court did not clearly err when it concluded the Plan satisfies the feasibility standard of § 1191(c)(3).

In its Remand Findings, the Bankruptcy Court found that Appellee proved both that it will be able to make all future plan payments (pursuant to § 1191(c)(3)(A)) and that it has a reasonable likelihood of making all plan payments (pursuant to § 1191(c)(3)(B)).[34] The Bankruptcy Court based these findings on three significant facts.

---

[33] 11 U.S.C. § 1191(c)(3).

[34] Remand Findings at 2 in Appellant's App. at 2626. The Bankruptcy Court first found that under § 1191(c)(3)(A), Appellee proved that it will be able to make all payments

11

First, Appellee's Cash Flow Projections, set forth in its Plan, demonstrate that it would be able to generate enough disposable income to make its monthly plan payments.[35] Second, Appellee's historical performance demonstrates a sufficient track record of making timely payments, which could be generalized forward.[36] Third, Appellee was not likely to be barred from obtaining future government contracts because it likely did not violate federal law.[37] The question thus becomes whether these three facts are supported by sufficient evidence.

    a.  Sufficient evidence establishes Appellee will be able to satisfy its Plan payment obligation under § 1191(c)(3).

Under chapter 11, feasibility mandates chapter 11 plans provide "a realistic and workable framework for reorganization."[38] While the Bankruptcy Court did not provide an extensive analysis of historical financial information and the Plan projections, such was not "strictly required."[39] However, it did, in fact, make necessary findings upon which feasibility under § 1191(c)(3) can be based.

The Bankruptcy Court primarily relied on the nature of Appellee's business and operations, combined with the structure of the Plan itself, to find the Plan was feasible

---

under its proposed plan. Then, the Bankruptcy Court extended this finding to § 1191(c)(3)(B) to determine that Appellee has shown a reasonable likelihood it will be able to make all payments under its proposed plan. The facts underlying both findings are identical.

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] *In re Inv. Co. of the S.W., Inc.*, 341 B.R. 298, 310 (10th Cir. BAP 2006).

[39] *In re Gentry*, 807 F.3d 1222, 1226 (10th Cir. 2015).

12

under either standard contained in § 1191(c)(3).[40] First, with respect to Appellee's business and operations, the Bankruptcy Court found in both its First Confirmation Order and its Remand Findings that Appellee had an on-going business operation, both pre-petition and during the bankruptcy case, which generated sufficient cash flow to pay operating expenses based on its model of operating under different contracts primarily with the VA.[41] Appellee historically paid all obligations promptly prior to the fee dispute with Appellant, including the firm's attorney fees, until Appellee received the firm's outlier October 2021 invoice in excess of $200,000.[42] Under its Plan, Appellee was not changing its business model or operations, and it had an established, successful track record of operating and making timely payments.[43] Specifically, the Bankruptcy Court found, but for the dispute with Appellant and its collection efforts, Appellee would not

---

[40] Note that the "reasonable likelihood" standard of § 1191(c)(3)(B)(i) is entailed within § 1191(c)(3)(A)'s "will be able" language, meaning if a debtor satisfied § 1191(c)(3)(A), it will also satisfy § 1191(c)(3)(B)(i).

[41] *See* First Confirmation Order at 16–17 in Appellant's App. at 2175–76 ("When Frontline incurs an obligation to pay its suppliers, it pays that obligation promptly. Historically, it paid all obligations promptly . . . until it received the Law Firm's October 2021 email . . . Frontline has an ongoing business that operated successfully in prior years and has continued to operate throughout its bankruptcy case, with cash flow sufficient to pay its operating expenses."); Remand Findings at 2 in Appellant's App. at 2626 ("For most of its history, Frontline operated successfully. It had minimal debt on which it made regular payments, and it regularly paid its suppliers and other expenses when due. It was not a highly leveraged company. It did not engage in risky financial transactions. If not for the dispute with the Law Firm and the expenses incurred defending the Law Firm's collection efforts, Frontline would not have needed to seek bankruptcy relief.").

[42] First Confirmation Order at 16 in Appellant's App. at 2175.

[43] *See generally* Plan at 4 in Appellant's App. at 893 ("Debtor has minimal hard assets . . . . The Debtor's other assets are comprised of intangible assets, including its website and good will. The Debtor's intangible assets only have value if the Debtor continues to operate as a going concern, as it is only by using such intangible assets in continued operations that the assets have any value.").

13

have needed to seek bankruptcy relief.[44] In short, the Bankruptcy Court found Appellee "regularly paid it suppliers and other expenses when due."[45] Finally, the Bankruptcy Court found Appellee had a history of successful operations, had minimal debt, was not highly leveraged, and did not engage in risky financial operations.[46]

Second, the only payment obligation under the Plan, other than administrative expense claims, was to pay unsecured creditors "a pro-rata distribution of a variable amount during the five (5) years following the Effective Date of the Plan . . . in an amount equal to 100% of the Debtor's projected disposable income."[47] While the Bankruptcy Court concluded the Plan contemplates Appellee will be able to generate disposable income to make payments under the Plan, the Plan, nevertheless, does not require, in any manner, payment to unsecured creditors if Appellee does not have disposable income.[48] This is to say Appellee's monthly payment obligation under the Plan is contingent on the generation of disposable income—the existence of monthly disposable income is a condition precedent for the unsecured creditors to receive payment. Based on the Plan's express term making any payment to unsecured creditors contingent upon there being disposable income, it is impossible to find Appellee could

---

[44] Remand Findings at 2 in Appellant's App. at 2626 ("If not for the dispute with the Law Firm . . . Frontline would not have needed to seek bankruptcy relief.").
[45] *Id.*
[46] *Id.*
[47] Plan at 5–6 in Appellant's App. at 894–95.
[48] That Appellee's Plan uses nonbinding language when setting out its unsecured claim payment obligation further bolsters this point. *See id.* at 6 in Appellant's App. at 895 ("Total distributions to Class 1 over five years are *estimated* to be *approximately* $41,487.98; an *approximate* 13.9% return.") (emphasis added).

14

not comply with the payment obligations thereunder. Appellee would not breach the Plan by failing to make a Plan payment if it did not generate disposable income in any given month. Appellee would only breach the Plan if it generated a disposable monthly income but did not pay it into the Plan. A feasibility determination must be made in the context of the terms of a debtor's plan, and according to its Plan, Appellee will be able to make all obligated payments.[49]

Accordingly, based on the Bankruptcy Court's express findings, it did not err when it determined Appellee would be able to make all payments under the Plan or would be reasonably likely to make all payments under the Plan.

b. Appellee likely faces no significant risk of being barred from future government contracts, making Appellant's allegations irrelevant to whether Appellee has a reasonable likelihood of making all Plan payments.

In its Remand Findings, the Bankruptcy Court wrote that it "cannot find Frontline or its principals violated federal law or are likely to be barred from obtaining future government contracts."[50] The First Confirmation Order, incorporated by reference into the Remand Findings, states:

> The Court cannot find improper prepetition conduct. The Law Firm argues Frontline and its principals violated federal law when they certified the Settlement Proposal for submission to the VA and then questioned the Law Firm's fees contained therein. The Court cannot agree. Under the law cited by the Law Firm, a false certification requires knowing and willful making of a materially false, fictitious, or fraudulent statement. Questioning a fee total or being unable to pay all of an unexpectedly large bill is not the same

---

[49] *See In re Gentry*, 807 F.3d 1222, 1226 (10th Cir. 2015) ("[I]t is necessary to put this feasibility determination in context by looking at the terms of the Gentry Plan.").
[50] Remand Findings at 2 in Appellant's App. at 2626.

as having the knowledge the legal fees were improperly submitted to the VA for payment.[51]

The Bankruptcy Court correctly identified that the False Claims Act requires the perpetrator to have submitted a "knowingly" false claim to the federal government for payment or approval.[52] Under Tenth Circuit precedent, liability under the False Claims Act

> can attach when a government payee submits either a legally or factually false request for payment. Claims arising from factually false requests generally require a showing that the payee has submitted an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided. Claims arising from legally false requests, on the other hand, generally require knowingly false certification of compliance with a regulation or contractual provision as a condition of payment.[53]

In either case, to prevail under the False Claims Act, a plaintiff "must establish (1) a false statement or fraudulent course of conduct; (2) made with the requisite scienter;

---

[51] First Confirmation Order at 16 in Appellant's App. at 2175.

[52] *See* 32 U.S.C. § 3279(a)(1)(A). The associated criminal statue, 18. U.S.C. § 1001(a)(2), demands proving that the defendant "knowingly and willfully . . . [made] any materially false, fictitious, or fraudulent statement or representation" to the United States government. Preliminarily, there is no evidentiary support that Appellee willfully made a false statement to the Veterans Administration (the "VA") or any other government agency. Similarly, there is no evidentiary support to prove such an allegation beyond a reasonable doubt, which this criminal statute demands. *See generally U.S. v. Tao*, 107 F.4th 1179, 1184 (10th Cir. 2024) (explaining that the beyond a reasonable doubt standard applies to 18 U.S.C. § 1001(a)(2)). The Bankruptcy Court therefore did not err when it expressly or impliedly determined that Appellee likely does not face criminal liability under 18 U.S.C. § 1001(a)(2).

[53] *U.S. ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1168 (10th Cir. 2010) (citations omitted) (quotations omitted).

(3) that is material; and (4) that results in a claim to the Government or conceals, decreases, or avoids an obligation to pay the Government."[54]

Appellant contends that Appellee violated the False Claims Act through its allegedly false "submission of the VA claim containing legal fees it impliedly certified as reasonable."[55] In essence, Appellant believes that because Appellee later "disavowed in writing [Appellant's fees] as allegedly unreasonable," Appellee's request that the VA reimburse those fees is necessarily a knowingly false statement presented to the U.S. Government.[56] Appellant's argument boils down to a contention that Appellee made a factually false request, i.e. it submitted a reimbursement for services that it did not believe were legitimately rendered.

Appellant's argument is not persuasive for two reasons. First, Appellee likely did not submit its VA reimbursement claim with the requisite scienter.[57] At the time Appellee sent its settlement proposal to the VA, it had not disputed the integrity or the legitimacy of the fees charged by Appellant. Appellee submitted its settlement offer to the VA on

---

[54] *U.S. ex rel. Janssen v. Lawrence Mem'l Hosp.*, 949 F.3d 533, 539 (10th Cir. 2020).
[55] Appellant's Br. at 37.
[56] *Id.* Part of the applicable Federal Acquisition Regulations allows for the reimbursement of professional service fees. *See* 48 C.F.R. §§ 31.205-33(b), (f). *See also Centech Grp., Inc. v. U.S.*, 175 Fed. Cl. 328, 348 (Fed. Cl. 2025) ("If a contractor incurred the cost for the genuine purpose of materially furthering the negotiation process, such cost should normally be a contract administration cost allowable under FAR 31.205-33, even if negotiation eventually fails and a CDA claim is later submitted.") (quoting *Bill Strong Enters., Inc. v. Shannon*, 49 F.3d 1541, 1549 (Fed. Cir. 1995) (overruled on other grounds by *Reflectone, Inc. v. Dalton*, 60 F.3d 1572 (Fed. Cir. 1995))).
[57] *See U.S. v. The Boeing Co.*, 825 F.3d 1138, 1149 (10th Cir. 2016) ("The relators must show more than a falsehood—they must show that Boeing *knowingly* presented a false claim for payment.").

17

October 29, 2021.[58] The offer listed Appellant's legal fees as totaling $264,980[59] and included Appellant's monthly billing records.[60] In the settlement offer, Appellee expressly "reserve[d] the right to update [its] legal fee[s] owed by the VA to Frontline."[61] While the evidence indicates that Appellee expressed concern with Appellant's legal fees on October 15, 2021,[62] an email from one of Appellee's principals (Mr. Steven Dumler) to Appellant on that same date does not indicate a dispute as to the legitimacy of Appellant's legal work—rather, Mr. Dumler wrote that he was "caught off guard by this [billing] email."[63] While Mr. Dumler admits that the "amount, terms and billing breakdown, are not what Frontline was expecting," he did not disavow the work that Appellant had done.[64] Rather, Mr. Dumler offered to "mail a check for $25,000 immediately" to Appellant and to work with Appellant "until the remaining balance is paid."[65]

Later, a November 3, 2021 email between Appellee (through Mr. Dumler) and Appellant illustrates that the dispute between the two was primarily over the presentation of Appellant's invoices and perhaps not over the quality of the work.[66] This is to say that Appellee was primarily concerned with how Appellant accounted for its legal work in its

---

[58] *Email* at 1–4 in Appellant's App. at 3061–64.
[59] *Id.* at 3–4 in Appellant's App. at 3063–64.
[60] *Billing Records* in Appellant's App. at 3071–95.
[61] *Id.* in Appellant's App. at 3095.
[62] *Email* in Appellant's App. at 3059.
[63] *Id.*
[64] *Id.*
[65] *Id.*
[66] *Email* in Appellant's App. at 3160.

18

invoices and not whether the legal work was done properly—the procedure of the invoices instead of the substance. The language of the November 3, 2021 email bolsters this interpretation. Mr. Dumler writes, "your billing records contain only block billing and vague entries . . . [t]he records you have provided are lacking sufficient details necessary to review and evaluate the time billed for each task performed."[67] In short, the evidence indicates that Appellee relied on Appellant's professional guidance when submitting its claim to the government[68] and did not dispute the legitimacy of Appellant's work, if at all, until after the claim was submitted. The record also indicates Appellant terminated the attorney-client relationship between it and Appellee on December 6, 2021, referencing alleged violations of "two civil / criminal Federal statutes."[69]

When Appellee submitted its settlement offer to the VA on October 29, 2021, it certified that the fees it incurred from Appellant were proper. This certification was made in good faith based on the information available to Appellee at the time. The fact that Appellee may have later disputed the legitimacy of Appellant's fees does not invalidate its prior good-faith submission—Appellee had reserved the right to update its legal fees request in its settlement offer.[70] The record also demonstrates Appellee did not dispute the legitimacy of Appellee's fees but rather only the procedure by which the fees were

---

[67] *Id.*

[68] The Court notes there is no evidence in the record that Appellant advised Appellee to withdraw the VA claim when Appellee voiced its concerns with the final invoice.

[69] *Email* in Appellant's App. at 3275–78.

[70] *Billing Records* in Appellant's App. at 3095.

presented for payment. As a result, Appellee did not likely make a "knowingly" false statement as to the fees when it submitted them to the VA for reimbursement.

Second, even if Appellee did submit the legal fees believing they were unreasonable, this Court questions whether such a belief is sufficiently objective in nature to give rise to False Claims Act liability. "[T]he FCA requires proof of an objective falsehood."[71] "[S]tatements as to conclusions about which reasonable minds may differ cannot be false."[72] This Court will not opine on whether Appellant's fees were reasonable or whether its billing practices were appropriate, but this Court imagines that reasonable minds could differ as to this question.[73] The VA, having the most expertise on issues of procurement disputes involving its own contracts, is likely the best-situated body to evaluate the reasonableness of fees incurred in a government procurement issue.

Finally, the Bankruptcy Court cannot and does not need to determine whether Appellant's attorney's fees were reasonable or whether Appellee is a "responsible" contractor under the Federal Acquisition Regulations. The Bankruptcy Court is not the

---

[71] *U.S. ex rel. Morton v. A Plus Benefits, Inc.*, 139 Fed. Appx. 980, 982 (10th Cir. 2005) (unpublished).

[72] *Id.* at 983 (quoting *U.S. ex rel. Roby v. Boeing Co.*, 100 F. Supp. 2d 619, 625 (S.D. Ohio 2000), *aff'd*, 302 F.3d 637 (6th Cir. 2002)).

[73] This Court recognizes that in some situations, an opinion of reasonableness can form the basis of False Claims Act liability. *See generally U.S. ex rel. Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 743 (10th Cir. 2018) ("[A] doctor's certification to the government that a procedure is 'reasonable and necessary' is 'false' under the FCA if the procedure was not reasonable and necessary under the government's definition of the phrase."). However, in *Polukoff*, the reasonableness of the medical procedures underlying the false claims was subject to well-established industry interpretations and understandings. Such is not the case with attorney billing practices, as there exists significant variety between specialties, geographic locations, and practice levels.

VA. Whether Appellant's attorney's fees were reasonable or whether Appellee is a

"responsible" contractor are not and were not ever questions before the Bankruptcy

Court. It might raise serious separation of powers concerns if a federal court were to

determine a fact within the jurisdiction of an executive agency. Instead, the only case and

controversy before the Bankruptcy Court was where there exists a "reasonable

likelihood" that Appellee will be able to make all payments under its plan. This question

demands only analyzing whether there is a reasonable likelihood that Appellee will

continue to receive government contracts. In light of the significant issues with

Appellant's False Claims Act argument, the answer is yes.

> 2.    The Bankruptcy Court did not clearly err when it determined that
> Appellee's Plan had sufficient default remedies.

In its Remand Findings, the Bankruptcy Court analyzed whether Appellee's Plan

proposed sufficient default remedies to constitute "appropriate remedies . . . to protect the

holders of claims or interests in the event that the [plan] payments are not made."[74] The

Bankruptcy Court explained,

> the only source of recovery for Frontline's creditors is Frontline's future
> earnings, which Frontline proposes to distribute through the Trustee,
> providing a level of protection not available outside of bankruptcy. Should
> Frontline default on its payment obligations, the Law Firm could seek relief
> from this Court, in addition to its state court remedies. The involvement and
> oversight of the Trustee and this Court provide adequate remedies in the
> event of Frontline's default.[75]

---

[74] 11 U.S.C. § 1191(c)(3)(B)(ii).
[75] Remand Findings at 3 in Appellant's App. at 2627.

21

The Bankruptcy Court observed that Appellee "does not have assets that would be valuable in liquidation."[76] Appellee's main asset is its preferred treatment under the Federal Acquisitions Regulations as a Service-Disabled Veteran-Owned Small Business. This status allows it to receive preferred treatment when it bids for government contracts. While interested parties can protest a firm's status as a Service-Disabled Veteran-Owned Small Business,[77] this status is itself non-transferrable.[78]

Appellee's predicted future receipts from these contracts fund its plan and contemplate a nearly 14% return to its unsecured creditors. Given that Appellant currently has a state-court lawsuit pending against Appellee, should Appellant receive relief from the automatic stay upon Appellee's default under the Plan, Appellant likely could recommence litigation and collection efforts. Although it is unclear what fruit such efforts would yield, the option for Appellant to seek relief from the automatic stay is in this case an "appropriate remedy" under § 1191(c)(3)(B)(ii).

---

[76] *Id.*

[77] *See generally* 48 C.F.R. § 19.307.

[78] There is a developing body of law as to whether the transfer or encumbrance of shares owned by a service-disabled veteran disqualifies the entity of its Service-Disabled Veteran-Owned Small Business status. *See generally E&L Constr. Grp., LLC v. U.S.*, 159 Fed. Cl. 115, 120 (Fed. Cl. 2022) (surveying developments in the VA and Small Business Administration regulations regarding the term "unconditional ownership" in situations involving whether a business is unconditionally owned by a service-disabled veteran). For the limited purpose of this opinion, this Court acknowledges that the status of being a service-disabled veteran itself cannot be transferred as a property right.

"There is not much guidance on what this provision [11 U.S.C § 1191(c)(3)(B)(ii)] requires plans to include."[79] "[T]he only express remedy in the Code is 'the liquidation of nonexempt assets,' which the debtor here does not have."[80]

In *In re Channel Clarity Holdings*, one of the few decisions on this issue, the Northern District of Illinois Bankruptcy Court held that merely allowing unsecured creditors to exercise their state-law remedies is "a toothless remedy" and denied confirmation in part on those grounds.[81] However, *Channel Clarity* is nonbinding precedent, and two significant facts distinguish it from the case at hand.

First, *Channel Clarity*'s debtor had a debt to asset ratio of 13.3.[82] In contrast, with assets totaling $98,287.22 and liabilities totaling $207,226.18, Appellee has a debt to asset ratio of 2.11, signifying much less indebtedness relative to its assets and higher liquidity.[83] Second, a significant concern of the *Channel Clarity* court was that the general unsecured creditors would have "no chance of recouping their losses [under state law] . . . [which] would spark [a] 'race to the courthouse.'"[84] Here, Appellee has only two

---

[79] *In re Channel Clarity Holdings LLC*, No. 21-bk-07972, 2022 WL 3710602, at *16 (Bankr. N.D. Ill. July 19, 2022) (unpublished).

[80] *In re Urgent Care Physicians, Ltd.*, No. 21-24000, 2021 WL 6090985, at *11 (Bankr. E.D. Wisc. Dec. 20, 2021) (unpublished).

[81] *In re Channel Clarity Holdings LLC*, 2022 WL 3710602, at *16.

[82] *See id.*

[83] *See Official Form 206Sum* in Appellant's App. at 28. Appellee's assets, according to its Plan, are the following: accounts receivable as of February 28, 2023: $28,089.58; furniture, fixtures, and equipment: $15,548.00; and cash in Appellee's bank account(s) as of February 28, 2023: $54,649.64. Plan at 4 in Appellant's App. at 893. Appellee's liabilities, according to its Plan, are the following: Appellant has an unsecured claim of $174,580; and Mr. Delmer Hamilton has an unsecured claim of $32,646.18. *Id.*

[84] *In re Channel Clarity Holdings LLC*, 2022 WL 3710602, at *16.

unsecured creditors. Appellant has a plan-listed claim of $174,580.00, and Mr. Delmer

Hamilton (the father of Lori Dumler, another principal of Appellee) has a claim of

$32,646.18.[85] Appellant has asserted a higher claim, but that does not appear to alter this

analysis. There does not appear to be a significant "race to the courthouse" worry here.[86]

Another significant case, *In re Urgent Care Physicians, Ltd.*, better speaks to

tensions in Appellee's default remedies.[87] The *Urgent Care Physicians* court also

acknowledged that there is "scant caselaw discussing what may constitute an

'appropriate' remedy for a default under a Subchapter V plan."[88] However, the *Urgent*

*Care Physicians* court went on to explain that "there is no indication that Congress

intended section 1191(c)(3)(B) to require anything beyond the preservation of a creditor's

rights to seek the enforcement of the plan terms in the bankruptcy court and, if necessary,

its rights under applicable state law."[89] The court continued that "[t]o the extent that the

debtor fails to pay unsecured creditors its projected disposable income as required by the

---

[85] *See Official Form 204* in Appellant's App. at 61.

[86] The reasoning in *In re Channel Clarity Holdings LLC* has appeared to gain some traction. *See, e.g.*, *Hamilton v. Curiel (In re Curiel)*, 651 B.R. 548, 562 n.11 (9th Cir. BAP 2023) ("[W]e agree with the bankruptcy court's observation in *In re Channel Clarity Holdings LLC* . . . . The requirement under § 1191(c)(3)(B)(ii) that the remedies provided be 'appropriate' suggests that they should be tailored to the situation."); *In re McBride*, No. 23-20168, 2023 WL 8446205, at *6 (Bankr. D. Me. Dec. 5, 2023) (unpublished) ("[A] remedy is insufficient protection under § 1191(c)(3)(B)(ii) if it is not tailored to the specific circumstances of the plan. Merely providing creditors with the opportunity to pursue their state law rights or to seek enforcement of a plan is insufficient.") (citation omitted). However, these cases are not binding upon this Court.

[87] *In re Urgent Care Physicians, Ltd.*, No. 21-24000, 2021 WL 6090985 (Bankr. E.D. Wisc. Dec. 20, 2021) (unpublished).

[88] *Id.* at *11.

[89] *Id.*

terms of the plan, this case will remain open and those creditors may seek relief in this [c]ourt based on the debtor's default under the plan."[90] The court therefore concluded "that the plan as drafted, in conjunction with the applicable provisions of the Code, provides appropriate remedies to protect claimholders if payments are not made."[91]

Given the fact that Appellee's business success is dependent entirely on future profits derived from the rare position Appellee's principal occupies, this Court agrees with the reasoning of *Urgent Care Physicians*. This Court concludes that Appellee's default remedies are sufficient. Therefore, the Bankruptcy Court did not err when it found that § 1191(c)(3)(B)(ii) was satisfied.

3. The Bankruptcy Court did not clearly err when it disregarded Appellee's lump-sum plan payment because Appellee's Plan contemplates such a situation.

Appellant contends that the Bankruptcy Court erred when "it entirely failed to address or otherwise consider the impact of the Debtor's . . . payment of the entire amount of its five-year Plan, in a single lump-sum payment" shortly after the First Confirmation Order was entered.[92] Appellant continues that the fact of this lump-sum payment "strongly suggests the Debtor is capable of paying significantly higher amounts under its plan."[93]

The Bankruptcy Court did not address Appellee's lump-sum payment, but such was not necessary. Appellee's Plan states that "[i]n the event that the Debtor's receipts

---

[90] *Id.*

[91] *Id.*

[92] Appellant's Br. at 23.

[93] *Id.*

25

exceed the amounts in the Projections, the Net of the all such [sic] receipts will be paid to creditors."[94] Consequently, Appellee's Plan obligates it to pay "100% of Debtor's projected disposable income . . . [set forth in its] Cash Flow Projections" regardless of the lump sum payment having been made.[95] Appellee's Cash Flow Projections contemplate a total predicted return of $41,487.98 to the general unsecured creditors (or about 13.9%).[96] On May 3, 2024, Appellee filed a *Notice of Substantial Consummation*, indicating that "the Plan has been substantially consummated" through Appellee's lump-sum payment of $41,487.98 to the subchapter V Trustee.[97]

When Appellee made its lump-sum payment, that payment did not change its obligations under its plan term. The lump-sum payment constituted an "event [where] Debtor's receipts exceed the amounts in the Projections."[98] Appellee remains obligated to make its monthly payments, insofar as it generates additional income. The existence of the lump-sum payment does not excuse Appellee from its continuing obligation to distribute the net of "all such receipts" to the unsecured creditors under the Plan.[99]

As such, when the Bankruptcy Court did not consider the effect of Appellee's lump-sum payment on its plan's feasibility, it was not an abuse of discretion. Appellee's Plan contemplates this very situation, and its language provides a solution—Appellee

---

[94] Plan at 6 in Appellant's App at 895.
[95] *Id.* at 5–6 in Appellant's App. at 894–95.
[96] *Id.*
[97] *Notice of Substantial Consummation* at 1 in Appellant's App. at 2576; *Response to Notice of Substantial Consummation* at 2 in Appellant's App. at 2586.
[98] Plan at 6 in Appellant's App. at 895.
[99] *Id.*

26

must keep paying its monthly disposable income to Subchapter V Trustee for distribution under the Plan. If the general unsecured creditors receive more than a 13.9% income, then all the more reason to consider Appellee's Plan a success.

Finally, the Bankruptcy Court was only charged in both its standard confirmation proceedings and through *Frontline I*'s Remand Order with considering the facts as they existed at the time of confirmation, not post confirmation events. Accordingly, it was not necessary for the Bankruptcy Court to even delve into the issue of Appellee's lump sum payment.

### V.     Conclusion

The Bankruptcy Court complied with the BAP's Remand Order in *Frontline I*. On remand, the Bankruptcy Court made its Remand Findings based on sufficient evidence already received during the hearing on plan confirmation, made an analysis of such evidence under the applicable feasibility standards under § 1191(c)(3), and concluded the Plan was feasible and confirmed the Plan. Therefore, the Bankruptcy Court did not err or abuse its discretion in re-confirming Appellee's Plan. The Bankruptcy Court's Remand Findings are accordingly AFFIRMED.